MENYUK, J.T.C.
Plaintiff, New York Susquehanna & Western Railway Corporation, seeks to rescind certain additional assessments of Class II railroad property for tax years 2001 and 2002 and brings this appeal pursuant to N.J.S.A. 54:29A-31, a provision of the Railroad Tax Law of 1948, as amended and supplemented. N.J.S.A. 54:29A-1 to -77 (the “Act”). It is plaintiffs contention that it had entered into closing agreements with defendant for the tax years in issue which finally and conclusively settled plaintiffs tax obligations for those years. See N.J.S.A. 54:53-1 to -6 (authorizing closing agreements in tax matters). The closing agreements relied upon by plaintiff were dated June 1, 2001 and April 1, 2002 (collectively, the “2001 and 2002 Agreements”).
Defendant, Director, Division of Taxation (the “Director”), contends that the 2001 and 2002 Agreements contemplate the making of the additional assessments where plaintiff failed to report additions to Class II property on its information returns. Alter *504 natively, he argues that, unless the assessments are permitted to stand, the property that is the subject of those assessments will escape taxation for the tax years in issue, and that he had no statutory authority to enter into a closing agreement which would permit an unintended exemption disadvantageous to the State. The Director asserts that, if the agreements do not provide for the making of the added assessments in issue, then the closing agreements are invalid and void.
This matter had previously come before the court on cross-motions for summary judgment, which were denied without prejudice for the reasons set forth in a letter opinion dated July 19, 2004. In that opinion, I concluded that the 2001 and 2002 Agreements, and particularly Section 2 of both agreements, were ambiguous and unclear, and directed a hearing on the facts surrounding their signing. I now conclude that the contested assessments should be invalidated.
This action arises out of the reassessment by the Division of Taxation (the “Division”) of all Class II railroad property in New Jersey for tax years 1995 through 1999. Class II railroad property is real estate used for railroad purposes, excluding the main stem and facilities used in passenger service. N.J.S.A. 54:29A-17.
The Act requires the Director to determine annually the true value of Class II property as of January 1 of the pretax year. Ibid. To enable the Director to perform this function, each railroad subject to the provisions of the Act is required to file a report by March 1 of each year, with statements or schedules showing the character and value of all of its property as of the preceding January 1. N.J.S.A. 54:29A-44. Following the filing of the annual reports, Division personnel examine the reports and may make field inspections of the taxpayer’s property. N.J.S.A 54.-29A-63. No later than November 10 of the pretax year, the Director is required to deliver to the taxpayer a detailed statement of the Division’s classification and valuation of the taxpayer’s Class II property. N.J.S.A. 54:29A-17. Prior to December 1, a taxpayer may inspect the Division’s classifications and valuations and confer informally with the Division as to the correctness of such classifi *505 cations and valuations so that any errors may be corrected prior to the Director’s assessment of Class II property. N.J.S.A. 54:29A-18.1. Following any informal conference, the Director is required to deliver to the taxpayer, no later than December 15, a detailed statement of the taxpayer’s Class II property, together with the assessment of that property for the following tax year. Ibid. These detailed statements are generally known as “bill books.”
When the Director later finds that any taxes assessed under the Act were less than or more than the amount lawfully assessable, he is authorized to correct any error or deficiency by reassessing the tax. N.J.S.A. 54:29A-25a. The Director may generally make reassessments or assess property omitted from an original assessment within four years from the date of the filing of the taxpayer’s annual report. N.J.S.A. 54:29A-27; N.J.S.A. 54:49-6b. In the case of a report that is false or fraudulent, filed with intent to evade the tax, there is no limitation on the time period for additional assessments. N.J.S.A. 54:29A-27; N.J.S.A. 54:49-6b.
Railroad property valuations had last been updated in 1966, and the reassessment undertaken by the Division was in the nature of a revaluation of Class II property.[1] The Division entered into a contract with the company that was to conduct the reassessment in early 1996, and the work was completed in early 1998. The reassessment used a completely different valuation methodology than had previously been employed by the Division.
William Black had been employed by the Division as a supervising engineer involved in the administration of the railroad tax for many years prior to his retirement in June 2002 and was familiar with the events surrounding the reassessment. He testified that the reassessment was intended to cover tax years 1995 through 1998, with a base year of 1996, which meant that the reassessment included all Class II property in railroad use as of January 1, 1995, the assessment date for tax year 1996. See N.J.S.A 54:29A- *506 17. According to Mr. Black, the reassessment “went back” one year from the base year and went forward two years from the base year. There was no further testimony by Mr. Black or by any other witness as to the methodology employed for the reassessment, including the method by which adjustments were made to the base year valuation to reach true value for tax years 1995, 1997 and 1998.
The Division notified the affected railroads in early 1998 of the reassessed valuations for tax years 1995 through 1998. Nathan Fenno, plaintiffs executive vice president and general counsel testified that, upon receipt of the new values assigned to their Class II properties, plaintiff and other railroads operating in New Jersey administratively protested the reassessment. Although administrative hearings on the protest of another railroad affected by the reassessment were commenced, plaintiffs protest never resulted in an administrative hearing. See N.J.S.A. 54:29A-26 (providing for a hearing by the Director for the purpose of reviewing reassessments of tax).
Rather, representatives of the affected railroads, including plaintiff, met several times with the Director and Division staff to discuss the appropriate methodology for the valuation of Class II railroad property. The parties failed to come to any agreement as to methodology, but in 1999, the parties entered into a closing agreement, dated June 16, 1999, covering tax years 1995 through 2000 (the “1999 Agreement”). That agreement is not the subject of the present dispute, but its provisions have a significant bearing on the 2001 and 2002 Agreements, since the parties acknowledge that the 2001 and 2002 Agreements were intended to be extensions of the 1999 Agreement. Further, the parties now agree that Section 2 of the 2001 and 2002 Agreements, which appears in an incomplete form in those agreements, was intended to be substantively identical to Section 7 of the 1999 Agreement.[2]
*507 The 1999 Agreement begins with a series of “whereas” clauses, one of which states that the parties were “desirous of resolving and settling all existing disputes as well as reducing the likelihood of similar disputes arising in future years” regarding the valuation of Class II property. Using language from N.J.S.A. 54:53-1, a section of the act authorizing the Director to enter into closing agreements, L. 1975, c. 387, the agreement further recites that the parties “agree that there is an advantage to both parties to have this matter permanently and conclusively closed and the State of New Jersey will sustain no disadvantage.”
The 1999 Agreement provides that the true value of each of the parcels of plaintiffs Class II property for tax years 1995 and 1996 would be those values as of January 1, 1994 and January 1, 1995, respectively, as reflected on the bill books and tax statements sent by defendant to plaintiff in December 1994 and again in December 1995, that is, prior to the reassessment. See N.J.S.A. 54:29A-18.1. For tax years 1997 through 2000, the parties agreed that the true value of Class II property would be based on the value of the property for tax year 1996 as set forth in attached schedules. The attached schedules set forth the pre-reassessment valuation for tax year 1996, and an increased valuation for each tax year after 1996, calculated by adding to the base year valuation a specified percentage of the base year valuation of a portion of plaintiffs Class II property. The remaining portion of plaintiffs property was not subject to the annual percentage increase in valuation. Accordingly, the 1999 Agreement reflects that the valuations (and as a consequence, the tax) for the tax years subsequent to tax year 1996 covered by the agreement would be higher than those used by the Division prior to the reassessment, because the old valuations for the base tax year, 1996, would be increased by a specified percentage of value each year. The valuations for tax years 1997 thorough 2000 set forth in the 1999 Agreement would nevertheless be lower than those valuations produced by the reassessment. Mr. Black agreed with plaintiffs attorney’s characterization of the valuations contained in the schedules to the 1999 Agreement as “arbitrary,” in the sense that they were based on percentage increases to old valuations and were not the result of an appraisal.
*508 Pursuant to the 1999 Agreement, the scheduled valuations for tax years 1997 through 2000 were “subject to any adjustments made pursuant to Section 7 of this Agreement.” Section 7 provided:
Tax parcels in the bill books as of January 1, 1996 which cease to be New York Susquehanna & Western’s Class II property during the term of this Agreement shall be removed from the bill book at their [tax year 1996 value as increased by the percentages as set forth in the attached schedules]. Tax parcels or improvements which are added subsequent to January 1, 1996 and which cease to be New York Susquehanna & Western’s Class II property during the term of this agreement shall be removed from the bill book at the same value as they were entered into the bill book.[3]
The 1999 Agreement further provided in Section 13 that defendant would not seek to revalue or reassess any of plaintiffs Class II property for tax years 1995 through 2000 inclusive, except pursuant to the terms of the agreement. Similarly, in Section 14 of the 1999 Agreement, plaintiff agreed that it would not seek to have any of its Class II property revalued for tax years 1995 through 2000, except pursuant to the terms of the agreement.
Following the signing of the 1999 Agreement, meetings among representatives of the railroad industry affected by the reassessment, including plaintiff, and representatives of the Division of Taxation continued throughout 2000, 2001 and 2002. In the spring of 2001, a conference was held at Division of Taxation headquarters during which there was a discussion of the valuation methodologies used by various states, and presentations were made by some of the railroads that had experience with railroad property taxation in other states. There was also some consideration of statutory and regulatory changes that might be necessary in order *509 to adopt a different methodology. The representatives also discussed the expiration of the 1999 agreement and how taxes for tax year 2001 should be calculated. According to Mr. Fenno, the discussion focused on an extension of the existing “deal,” that is, any agreement for 2001 was to be a “stand still” agreement for each of the affected railroads, generally using the base year valuations set forth in the 1999 agreements and providing for a percentage increase, while the parties continued to address valuation methodology. Similarly, in March 2002, there was another meeting of representatives of defendant and of the affected railroads at which there was, again, discussion of the need to extend the existing agreements. According to Mr. Fenno, there was no discussion at that meeting regarding adjustment of the scheduled valuations, and that the 2002 closing agreement was intended simply to be an extension of the prior agreements.
The 2001 and 2002 Agreements, which, except for the tax years involved, are identical, both contain provisions apparently taken from the 1999 Agreement. The “whereas” clauses contained in the 2001 and 2002 Agreements, for example, are identical to those of the 1999 Agreement. Notably, however, there are no provisions in the 2001 and 2002 agreements that are the equivalent of Sections 13 and 14 of the 1999 Agreement, which provided, respectively, that no revaluations would be undertaken by defendant and that no appeals would be brought by plaintiff during the term of the agreement. Neither party offered any testimony or other evidence as to the significance of the deletion of Sections 13 and 14 from the 2001 and 2002 Agreements.
As does the 1999 Agreement, the 2001 and 2002 Agreements also provide that the true value of Class II property for each of those tax years was to be based on an attached schedule that maintained the valuation at the same level as had been assigned in the 1999 Agreement to tax year 2000, “subject to adjustments made pursuant to Section 2 of this Agreement.” Section 2 of both the 2001 and 2002 Agreements is plainly garbled, perhaps due to a word processing error, with its second sentence being only a fragment. It reads:
*510 Tax parcels in the bill books as of January 1, 2000 [or 2001] which cease to be New York Susquehanna & Western’s Class II property during this Agreement shall be removed from the bill book at their value as determined at their [1996 value as increased by the percentages as set forth in the attached schedules]. Tax parcels or improvements which are added subsequent to January 1, 2000 [or 2001] and which cease to be removed from the bill book at the same value as they were entered in the bill book. [sic].
Mr. Fenno testified that, although he recognized that Section 2 of the 2001 and 2002 Agreements was grammatically incorrect and that he “scratched his head” over the garbled language, he understood that it was to have the identical meaning as Section 7 of the 1999 Agreement.
James Coll, the chief of local assessment compliance within the Division, to whom Mr. Black reported and who was the Division’s project manager for the reassessment, testified that the original draft of the 1999 Agreement was prepared by a lawyer for another railroad that was already involved in the administrative hearings. He testified that the agreement went back and forth among the Division and the various railroads, and that suggestions by the Division and the railroads were incorporated into the document. Mr. Coll stated that all of the Division’s separate agreements with each railroad were the same, except for the agreement with the plaintiff, which provided that only a portion of its property would be subject to the annual percentage increases in valuation. That particular provision had been negotiated by Mr. Fenno on plaintiffs behalf.
Mr. Coll testified that it was at his suggestion that Section 7 had been added to the 1999 Agreement. According to Mr. Coll, he realized that if property included in the 1996 base year valuation subsequently was removed from railroad use after 1996, but during the term of the 1999 Agreement, that property had to be removed from the bill books at its value as increased by the annual percentage adjustments, and not just at its base year values. This is because it would be unfair to the railroads to make a downward adjustment in valuation based on the original base year value and not take into account valuation created by the annual percentage increases computed on the basis of the removed property. Further, and more significantly for purposes of this *511 action, Mr. Coll testified that Section 7 also provided that, because property added after January 1, 1996, would be added at “true value,” and would not be subject to the annual percentage increases to which 1996 base year property was subject, such property when removed from railroad use, would be removed at the same value at which it was added to the bill books.
The Director maintains that it was this latter provision that plainly contemplated additions of property to the property existing in 1996. Apart from the addition of Section 7 to the 1999 Agreement, Mr. Coll testified that the subject of the valuation of property coming into railroad use after the 1996 base year never came up in the Division’s discussions with the railroads.
On cross-examination, defendant’s engineer, Mr. Black, testified that, prior to completion of the reassessment in early 1998, he sent out annual tax bills for tax years 1995 to 1998, presumably based on the valuations used prior to the reassessment. He conceded that, during this period, he continued to review the annual information returns filed by plaintiff and other railroads and continued to make inspections of railroad property where additions and other changes were reported. According to Mr. Black, the bills initially issued to the railroads for tax years 1995 through 1997 included changes and additions reported for those tax years, as well as additions and changes noted during inspections by the Division.
Mr. Black also testified that the valuations for tax years 1998, 1999 and 2000 contained in the schedules to the 1999 Agreement did not take into account removals from or additions to Class II property that had been reported in the annual returns for those tax years because the returns had not been field checked at the time the agreement was entered into. That is, Division staff had not yet inspected the property.
Patricia Douglas, a senior field representative employed by the Division, reported to Mr. Black prior to his retirement in June 2002 and took over his responsibilities for the billing of the tax on Class II railroad property following Mr. Black’s retirement. Ms. Douglas testified that she reviewed plaintiffs annual returns filed *512 in March 2000 and in 2001, which should have included property owned by plaintiff as of January 1, 2000 and January 1, 2001, respectively. See N.J.S.A. 54:29A-44. Ms. Douglas was also part of a team that took part in inspections of plaintiffs Class II property in North Bergen on two occasions that are relevant here. The first visit was in November or early December 2000 and the second visit was later in December 2000. Ms. Douglas could not recall the reason for the first visit, but the second visit was made because of changes and additions reported on plaintiffs March 2000 return.
Specifically, the return listed the addition of fencing at plaintiffs North Bergen yard. According to Ms. Douglas, the Division’s inspection disclosed that plaintiff had added lighting and paving that had not been reported on the returns. The Division’s measurements also indicated that plaintiff had installed more fencing than had been reported on plaintiffs March 2000 return. The installation of additional fencing at the North Bergen yard was also reported on plaintiffs March 2001 return, and Ms. Douglas conceded that she had no way of knowing when any of the improvements had actually been made. She could not recall whether she had inspected the property following the filing of the March 2001 return. There is no question, however, that the Division knew of the property that was the subject of the additional assessments in issue here no later than December 2000, with the possible exception of the additional fencing reported on the March 2001 return, which could conceivably have been installed between the December 2000 inspection and January 1, 2001, the valuation date for tax year 2002.
These additions to plaintiffs property were not included in the valuations listed in the original schedules to the 2001 and 2002 Agreements. The Division had experienced a computer “crash” in early Fall 2000. As a consequence of its computer difficulties, the Division’s Class II property valuation data had to be re-entered into the computer. The Division’s computer issues were not corrected until June 2002, and the Division could not update its Class II property data base or issue any bills adjusted for added or removed property while this was being done. Mr. Black *513 testified that he told a representative of another railroad about the Division’s computer problems during the October 2000 meeting, but that no general announcement was made to all of the railroad representatives. Mr. Black testified that he had attended a meeting between the Division and representatives of the various railroads which he believed to have taken place in October 2002. At that meeting, a representative of another railroad asked when the adjustments to the 1999 Agreement would be ready and the Division responded that it was working on it. To the Division, this question signified that the railroads knew that the Division was to make adjustments for property added and deleted in years covered by that agreement. As used in that context, however, the term “adjustments” could have been intended to mean the increase in taxes billed on account of the percentage increases to scheduled valuations which were higher than the amounts originally billed for tax years 1997 and 1998.
Following Mr. Black’s retirement in June 2002, Ms. Douglas commenced the process of preparing bills for additions to and deletions from railroad property. The first bill prepared by Ms. Douglas was for tax year 2002, and was sent under cover of a letter from Assistant Director Stephen Sylvester, dated October 29, 2002. Enclosed with the letter was a copy of the 2002 closing agreement that had been signed by the Director but not by plaintiff. A revised schedule was appended to it showing that plaintiffs Class II property had a valuation that was $1,059,289 more than that shown on the original schedule, which additional amount represented the value of the property added at the North Bergen yard. The additional tax on the valuation added was approximately $69,000 more than originally billed. This bill was finalized by the Division’s letter dated January 7, 2003 to plaintiffs president.
A second billing was sent out together with a covering letter from Stephen Sylvester dated December 15, 2003, covering tax years 1997 through 2001. These bills reflected total tax reductions for tax years 1997 through 2000 of approximately $2000 and additional taxes of approximately $69,000 for tax year 2001. The billing for tax years 1997 through 2001 was finalized by the *514 Division’s letter dated January 8, 2008. The plaintiffs complaint was timely filed with the Tax Court on March 31, 2003. See N.J.S.A. 54:29A-31.
There is no dispute that the 2001 and 2002 Agreements were intended to have the same purpose and effect as the 1999 Agreement. The difficulty, of course, is that the parties dispute the purpose and effect the agreements were to have.
Mr. Coll testified that, prior to the execution of the 1999 Agreement, the Division was in the midst of what threatened to be lengthy administrative hearings regarding the reassessment of the Class II property belonging to a major railroad,[4] and was also meeting with all of the affected railroads to determine the methodology that should be used in the valuation of Class II railroad property. According to Mr. Coll, the purpose of the 1999 Agreement, as well as the 2001 and 2002 Agreements, was to avoid an appeal and litigation of the reassessment in the Tax Court while the Division reviewed alternative valuation methods and until the parties came to an agreement regarding a valuation method.
Mr. Fenno testified that he viewed all three agreements as a settlement of the taxes due for the respective tax years in issue, including the two years in issue here. It was his understanding that the Director could not malee any adjustments to the valuations set forth in the schedules to the various agreements because, at the time the agreements were entered into, all information *515 returns listing the plaintiffs property for each of the tax years covered by the agreement would have been filed. By the time the parties signed the June 16, 1999 agreement covering tax years 1995 through 2000, plaintiff had filed all of its returns for the tax year's covered by the agreement, including the return due March 1, 1999. Similarly, the returns due March 1, 2000 and March 1, 2001 had been filed before the parties entered into the 2001 and 2002 Agreements, respectively. The Division does not dispute that the relevant tax returns had been filed at the time it entered into the 1999 Agreement and the 2001 and 2002 Agreements.
In plaintiffs view, at the time that the 1999 Agreement was entered into, defendant had the information necessary to audit plaintiffs returns and determine what property should be included in the assessment schedules for all tax years through 2000. Similarly, when Mr. Fenno received the 2001 and 2002 Agreements and the associated schedules and tax bills, they conformed with what he expected after the meetings at which the respective extensions had been discussed. That is, the original tax bills for 2001 and 2002 were the same amount as the bill for tax year 2000. Plaintiff maintains that the schedules of valuation appended to the 2001 and 2002 Agreements or the taxes due for those years, could not be changed after the fact because the information returns listing plaintiffs property valued as of January 1, 2000 and January 1, 2001 had been filed in March 2000 and March 2001, respectively, and the closing agreements were precisely that: agreements that were intended to finally and conclusively settle plaintiffs tax liabilities for those years. Mr. Fenno understood that defendant would have adjusted the schedules appended to the closing agreements if plaintiffs returns or defendant’s audit of those returns disclosed that property had been added or subtracted after January 1, 2000.
On cross-examination, Mr. Fenno conceded that plaintiff had omitted some property from its 2000 and 2001 returns. While the parties disagreed as to the value of the omitted property, Mr. Fenno was willing to characterize the omission as significant. He testified, however, that at the time the 2001 and 2002 Agreements were signed, he believed that defendant had taken into account all *516 of plaintiffs property. He further testified that he had learned only later that property had been omitted from plaintiffs returns, and that defendant had not included the omitted property in the schedules appended to the 2001 and 2002 Agreements.
As explained by Mr. Fenno, Section 7 of the 1999 Agreement and, later, Section 2 of the 2001 and 2002 Agreements, were intended to have the same purpose: those paragraphs set forth the methodology by which the bill books would be adjusted in subsequent tax years to account for property removed from service by setting forth the way in which the dollar amount of the property to be subtracted would be determined.
Both Mr. Black and Mr. Coll testified, however, that the “disputes” referred to in the “whereas” clauses of the 1999 Agreement and later, in the 2001 and 2002 Agreements, referred to the disputes over the valuation of properties that took place as a consequence of the reassessment. In other words, the three agreements were intended to be “closing agreements” only with respect to the dispute regarding the reassessment, and that the agreements were never intended to address the issue of property added during the periods covered. In Mr. Coil’s view, the 2001 and 2002 Agreements were not really necessary, because the Division intended to maintain the base values set forth in the 1999 Agreement. Mr. Coll stated that there were no further agreements after the agreements in issue here, because the Division eventually came to the conclusion that it would not adopt the method of valuation employed in the reassessment.
It was Mr. Black’s testimony that there was nothing in the agreements that would preclude an added assessment or that provided for added assessments. It was his understanding that the statutory provisions for the assessment of omitted property, N.J.S.A. 54:29A-25b, would be used to account for property added after 1996. Mr. Coll testified that the Division would not have considered entering into a closing agreement that precluded assessments for additional property because the Division is obliged to assess everything that is legally assessable.
*517 Both parties introduced into evidence copies of correspondence that were claimed to demonstrate what one or the other party knew or should have known. One of these was a letter dated October 21, 1999, by which plaintiffs attorney returned copies of the 1999 Agreement that had been signed on behalf of the plaintiff to the Division for the signature of the Director. The letter stated that, “[u]pon signing of the agreement by the Director and [its] return to me, [plaintiff] will forward the balance due for their taxes in 1997 and 1998.” As acknowledged by Mr. Black, however, that reference was intended to convey that the plaintiff recognized that its tax liabilities for those tax years had increased as a consequence of the higher valuations for those years as provided in the 1999 Agreement, which exceeded the valuations in the original bills. In other words, the letter did not suggest that plaintiff knew that its tax liability would increase as a consequence of any additions to its Class II property that had been omitted from the schedules of the 1999 Agreement.
Defendant also pointed to a letter dated May 22, 2001 from Mr. Black to plaintiffs outside counsel enclosing the closing agreement with plaintiff for tax year 2001 as well as the closing agreements for the attorney’s other railroad clients,[5] in which Mr. Black stated, “We anticipate in the very near future to have all adjustments made for tax years 1997, 1998, 1999 and 2000 ready for mailing to your clients.” Defendant maintains that plaintiff, therefore, knew of defendant’s intention to make additional assessments even before it signed the 2001 closing agreement. The letter also stated, “The agreement will keep the Class II true value of each tax parcel at 125% of that parcel’s value for tax year 1996, subject to annual adjustments. Essentially it maintains the 2000 tax year true value.” Mr. Fenno had no recollection of whether he had ever received a copy of this covering letter or whether he had discussed it with plaintiffs outside counsel.
*518 I conclude that there is nothing in that letter from which I can infer that plaintiff had knowledge of defendant’s intention of making additional assessments on account of property added during the period covered by the 1999 Agreement, or of defendant’s intention to make such additional assessments after the
2001 and 2002 Agreements had been signed. Rather, it reinforces plaintiffs contention that the closing agreement for tax year 2001 (and, by implication, the agreement for tax year 2002) was a simple extension of the 1999 Agreement and that plaintiffs Class II property valuation was to be maintained at the same level as the prior year. Mr. Black’s reference to “adjustments” for tax years 1997 through 2000 is most credibly explained as a reference to Section 7 of the 1999 Agreement, which permitted “adjustments” for deletions, but not for additions, to property.
There was some dispute regarding when Mr. Fenno received the closing agreement for 2002. Defendant produced a copy of the agreement with the original signatures of Mr. Fenno and the Director, accompanied by a covering letter dated November 6, 2002 from Mr. Fenno to Stephen Sylvester, Assistant Director of the Division. The letter states: “Enclosed please find a fully signed Closing Agreement submitted on behalf of The New York, Susquehanna and Western Railway Corporation.” The Division’s point in introducing this evidence was that Mr. Fenno’s covering letter was dated after an October 29, 2002 letter enclosing the added assessment for 2002 in issue here, and that Mr. Fenno must, therefore, have known of the added assessment at the time he signed the 2002 closing agreement.
Plaintiff, however, introduced a copy of a letter from plaintiffs outside counsel to Mr. Fenno dated August 8, 2002, enclosing a signed copy of the closing agreement for tax year 2002. Appended to the letter and the agreement was an envelope from plaintiffs outside counsel’s law firm addressed to Mr. Fenno, and bearing a postmark of August 8, 2002. Also introduced was a copy of a memorandum from Mr. Fenno dated August 14, 2002, forwarding a copy of the agreement to other employees of plaintiff.
*519 The copy of the closing agreement enclosed with the August 8, 2002 letter bore the signatures of Mr. Fenno and the Director, but it was clear that they were not the signatures appearing on the agreement enclosed with Mr. Fenno’s letter of November 6, 2002. There were slight differences in the signatures themselves, and on one copy, plaintiffs name had been typed above the signature line and Mr. Fenno’s name and title had been typed in below the signature line. On the other copy, this information had been handwritten.
No witness could supply an explanation as to why Mr. Fenno forwarded what now appears to be a duplicate original of the 2002 closing agreement to Mr. Sylvester on November 6, 2002. I nevertheless find from the August 8, 2002 letter, the envelope postmarked August 8, 2002, and the memorandum dated August 14, 2002, that the agreement had been fully executed by both parties several months before plaintiff received notice of the added assessment for 2002.
By their express terms, the 2001 and 2002 Agreements in issue (as well as the earlier 1999 Agreement) were made “pursuant to the provisions of N.J.S.A. 54:53-1 et seq.” N.J.S.A. 54:53-1 authorizes the Director to enter into a written agreement with any person
“... in respect of any State tax for any taxable period ending prior or subsequent to the date of such agreement ... [wherel there appears to be an advantage in having the case permanently and conclusively closed, or if good and sufficient reasons are shown by the taxpayer for desiring a closing agreement and it is determined by the director that the State will sustain no disadvantage through consummation of such an agreement.” (Emphasis added).
Except upon a showing of fraud or malfeasance or misrepresentation of fact, a closing agreement is “final and conclusive,” N.J.S.A. 54:53-4, and a case may not be reopened as to the matters agreed upon or the agreement modified by any State employee or officer, N.J.S.A. 54:53-4a. Finally, no closing agreement may be annulled, modified, set aside or disregarded in any suit, action or proceeding, except where there is a change in the law enacted after the agreement is entered into. N.J.S.A. 54:53-4b.
*520 There are few published cases construing the statutory-provisions authorizing closing agreements, presumably because the statute itself severely limits the circumstances under which such an agreement may be successfully attacked. General principles of contract interpretation apply to closing agreements. GNOC Corp. v. Director, Div. of Taxation, 328 N.J.Super. 467, 476, 746 A.2d 466 (App.Div.2000). Because settlement of disputes is a priority in tax as well as other settings, however, “courts will strain to give effect to the terms of a closing agreement whenever possible.” Boardwalk Regency Corp. v. Director, Div. of Taxation, 18 N.J.Tax 328, 333 (App.Div.1999).
I find that there was no showing of fraud, malfeasance, or misrepresentation by plaintiff that would warrant the reopening of the 2001 and 2002 Agreements. Plaintiff concedes that it omitted some property from its March 2000 and/or March 2001 returns. It reported other improvements at the same rail yard, however, which was inspected by the Division in December 2000, at which time the Division discovered unreported improvements. There was no evidence that plaintiff had intentionally omitted the improvements in issue from its returns. As conceded by Mr. Black, variances between the Division’s records and the railroads’ reports are routinely the subject of informal discussions between the railroads and the Division before the final tax bills are issued. N.J.S.A. 54:29A-18.1 specifically provides for informal conferences and the correction of any errors appearing in the Division’s statements of valuation. Under normal circumstances, the Division’s preliminary statements of valuation of Class II property, which N.J.S.A. 54:29A-17 requires the Division to issue annually by November 10, would have revealed the discrepancy between plaintiffs reports and the results of the Division’s inspection, before a final statement and bill were issued. See N.J.S.A. 54:29A-18.1.
According to Mr. Black, plaintiff was not notified of the discrepancy at the time that it was discovered. The Division did not issue the preliminary statements in 2000 and 2001 because of its computer difficulties and plaintiff had no opportunity to resolve the discrepancy informally as contemplated by N.J.S.A 54:29A- *521 18.1. Plaintiff first received notice of the discrepancy in late 2002, when the bills for the omitted property were issued. Regardless of any omission in plaintiffs returns, however, the Division actually knew of the omitted property before entering into the 2001 and 2002 Agreements dated June 1, 2001 and April 1, 2002, respectively. Under these circumstances, there was no fraud, malfeasance, or misrepresentation of fact by plaintiff that would upset the finality and conclusiveness of the 2001 and 2002 Agreements.
The Director argues that the 2001 and 2002 Agreements were intended to be closing agreements only with respect to the property that was valued in connection with its reassessment of Class II property, because it was only the valuation of that property that was the subject of the “disputes” that are referenced in the agreements, and not the valuation of property added after the revaluation, as to which the Director asserts there was no dispute. The Director notes that, in addition to resolving a taxpayer’s entire tax liability for a given period, closing agreements may cover separate items affecting a taxpayer’s liability. N.J.S.A. 54:53-3.
Initially, it is difficult to understand how there was no dispute as to how added property was to be valued, since the parties were engaged in an ongoing dispute as to the appropriate methodology for the valuation of Class II railroad property. Moreover, the plain words of the agreement do not limit the agreement only to property in railroad use at the time of the reassessment. The agreement provides: “The true value of each tax parcel of New York Susquehanna & Western’s Class II property for Tax Year 2002 shall be based on the attached schedule of that parcel’s value for Tax Year 1996, subject to adjustments made pursuant to Section 2 of this Agreement.” (Emphasis in original.)
The meaning of Section 2, made ambiguous due to an apparent typographical error, was made clear by the testimony of witnesses for both parties: Section 2 was intended to have the identical words and meaning as Section 7 of the 1999 Agreement. Section 7 of the earlier agreement dealt solely with adjustments to valuation on account of the removal of property that existed as of the *522 base year and the removal of property added after the base year. It is only in that very limited context that the agreement mentions a change in valuation for added property. Defendant’s witnesses candidly conceded that nothing in the 1999 Agreement or in the 2001 and 2002 Agreements addresses adjustments to valuation on account of additions to Class II property, but rather, any adjustments to the amounts included in the original schedules to the 2001 and 2002 Agreements for additions to property are based solely on the Director’s statutory right to make assessments for omitted property. N.J.S.A 54:29A-25b.
The Director argues that Section 2 implies that adjustments can be made for property added subsequent to the revaluation year, since it provides for the deletion of that added property. First, additions to property in railroad use had actually been made and included in the schedules to the 1999 Agreement and later, in the 2001 and 2002 Agreements. Section 7 of the 1999 Agreement refers to “tax parcels in the bill books as of January 1,1996 which cease to be New York Susquehanna & Western’s Class II property.” Property in the bill books as of January 1,1996 was property that was in railroad use on the previous January 1, 1995. See N.J.S.A. 54:29A-17, -18.1. As Mr. Black testified, additions to property for tax years through tax year 1997, for which the original bill books were finalized in December 1996, see N.J.S.A. 54:29A-18.1, had been included in the schedules appended to the 1999 Agreement. Construing the agreements literally, property added subsequent to January 1, 1995, but before January 1, 1996 and later deleted, is a deletion referred to in Section 7 of the 1999 Agreement and Section 2 of the 2001 and 2002 Agreements.
More to the point, the Division knew of the additions to property when it entered into the 2001 and 2002 Agreements and did not include it in the appended schedules, or make plaintiff aware of the omission, or reserve the right to make an omitted assessment, yet nevertheless entered into a closing agreement which by statute, N.J.S.A. 54:53-4, may not be reopened or modified by any State officer or employee. Under these facts, the Division may not later rely on the Director’s statutory authority to make assessments of omitted property. If the Division intends to *523 modify a closing agreement based on a statute permitting such assessments, it must explicitly say so in the closing agreement.
I find from the testimony that this lapse was not designed by the Division to mislead the plaintiff as to its intent to make assessments for omitted property at a later date, but it nevertheless had that effect. I find that Section 2 of the agreements in issue is not ambiguous. It provides for deletions of added property. It does not provide for additions to property. I conclude that, even if Section 2 contains an implication that the Director would later be permitted unilaterally to amend the schedules to the 2001 and 2002 Agreements in order to include omitted property, that implication is so oblique as to be missed entirely. What appeared to plaintiff to be final and conclusive agreements as to its tax liability for tax years 2001 and 2002 were suddenly not when plaintiff was billed in late 2002 for assessments on account of omitted property.
The Division’s witnesses plainly indicated that the Division was very anxious to avoid litigation over the reassessment and that was its principal motivation in entering into the 1999 Agreement as well as the 2001 and 2002 Agreements. Had the Division explicitly disclosed and included in the agreements its intention to make additional assessments for property omitted from the schedules appended to the 2001 and 2002 Agreements, the possibility exists that plaintiff (and the other affected railroads) would not have been willing to enter into agreements waiving the right to litigate. The Division has received the benefit of its bargain. Too, as pointed out by plaintiff, the taxes for tax years after 1996 were based on a higher valuation than the valuations in place before the reassessment, so that the State received increased tax revenues, even though its reassessment has not been implemented.
“[WJhere the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written.” City of Orange v. Empire Mortg. Servs., 341 N.J.Super. 216, 224, 775 A.2d 174 (App.Div. 2001) (quoting Karl’s Sales and Serv., Inc. v. Gimbel Bros., Inc., *524 249 N.J.Super. 487, 493, 592 A.2d 647 (App.Div.), certif. denied, 127 N.J. 548, 606 A.2d 362 (1991)). Courts may not remake a better contract for the parties than they themselves have seen fit to enter into, or to alter an agreement for the benefit of one party and to the detriment of the other. Ibid. I conclude that I may not alter the terms of the 2001 and 2002 Agreements as they were written. As noted earlier, N.J.S.A. 54:53-4b prohibits the modification of a closing agreement in any suit, action, or proceeding. To permit the additional assessments in issue here is to permit a modification of the schedules to the 2001 and 2002 Agreements, which were integral parts of those agreements.
Finally, the Director argues that, because he has no authority to enter into an agreement which is disadvantageous to the State, the 2001 and 2002 Agreements must be invalidated if the court construes them as prohibiting assessments for omitted property. See N.J.S.A. 54:53-1. Initially, it is not at all clear that it was disadvantageous to the State to enter into these closing agreements, notwithstanding that I have determined that the additional assessments violate the terms of the 2001 and 2002 Agreements. As already noted, the Division and the State obtained substantial benefits as a consequence of those agreements.
Further, the Director’s argument was flatly rejected by the Appellate Division in Boardwalk Regency Corp., supra, 18 N.J.Tax at 333. In that ease, the Tax Court judge found that the Director could not have intended to enter into a closing agreement that would have completely released the taxpayer from tax liability on the purchase of certain beverages from suppliers, because such a provision would not have been advantageous to the State. The Appellate Division disagreed with that construction of N.J.S.A. 54:53-1, holding that, “[t]he Director has broad discretion, and if the agreements were designed to settle a dispute concerning the taxability of transactions, including those now in dispute, the administrative action must be deemed presumptively valid.” Ibid.
For the foregoing reasons, I conclude that the Director’s assessments of additional tax for tax years 2001 and 2002 violated the *525 terms of the 2001 and 2002 Agreements, and that those assessments must be rescinded. Plaintiffs counsel is directed to submit a form of final order and judgment pursuant to R. 4:42-1 (c).

 Some of the witnesses used the term “reassessment" and “revaluation" interchangeably. N.J.S.A. 54:29A-25a uses the term reassessment, which is the term that will be used here.

 Plaintiff had previously declined to acknowledge that intention, which was one of the reasons for denial of the cross-motions for summary judgment.

 As written, paragraph 7 creates a gap of one year as to which no provision is made for removal of additions or improvements. This is because the bill books include property valued as of January 1 of the year preceding the tax year, N.J.S.A. 54:29-17, and are delivered by the Director to the taxpayer by December 15 for the following tax year. N.J.S.A. 54:29-18.1. Here, property in the bill books as of January 1, 1996, was property in existence on January 1, 1995, and its later removal is covered by the first sentence of the paragraph. The removal of property added after January 1, 1996 is covered by the second sentence. There is no provision for the later removal of property added after January 1, 1995 through January 1, 1996.

 No witness identified by name any other railroad involved in the reassessment, administrative protest, and subsequent meetings among defendant and the railroads. There was testimony to the effect that all affected railroads entered into closing agreements similar to those entered into by plaintiff here. There was apparently some concern that the disclosure of the identity of other affected taxpayers would violate nondisclosure provisions contained in the closing agreements and also would be contrary to N.J.S.A. 54:50-8a, which provides, with certain exceptions, that the Director’s records regarding the administration of state taxes shall remain confidential. Because all Class II railroad property in the state was the subject of the reassessment, and because the ownership of property is a matter of public record, the identification of the other railroads implicated by the reassessment does not appear to be a violation of N.J.S.A. 54:50-8a. Whether the Director should be permitted to enter into confidential closing agreements that are not open to public scrutiny is an issue that was not directly presented and was not considered here.

 Plaintiff's lawyer, who represented it in this action, represented plaintiff and other railroads at the meetings between the railroad industry and the defendant, and in connection with the closing agreements between defendant and plaintiff and also between defendant and several other affected railroads, including the railroad that had prepared the original draft of the 1999 Agreement.